Filed 7/28/25  In re M.S. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | |
| LAKE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>D.S.,<br><br>        Defendant and Appellant. | A172076<br><br>(Lake County<br>Super. Ct. No. JV320663) |

D.S. (Mother), mother of minor M.S., appeals from an order of the juvenile court terminating her parental rights.  Mother contends the court erred in concluding the beneficial relationship exception to termination of parental rights did not apply because the Lake County Social Services Agency (Agency) failed to provide the court with objective, disinterested information about the nature and quality of visits between Mother and M.S. We find no prejudicial error and affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Prior Dependency Case

M.S. was born in January 2012, testing positive for opiates. In a prior dependency matter, then-three-month-old M.S. was removed from the care of his parents, Mother and B.S. (Father), and placed into foster care at the home of family friends. The charging petition alleged that Mother had mental health instability, unpredictable behavior, and ongoing prescription drug abuse and mental health issues, and that Father was unable to care for the child due to a temporary no-contact order issued in a parallel family court proceeding.

By the time of the 12-month review hearing in November 2013, Father had successfully reunified with M.S. Mother, however, failed to make sufficient progress on the problems that led to the dependency, and the juvenile court terminated reunification services as to her. Mother was granted supervised in-person visitation with M.S.

### B. Continued Referrals (2018–2020) and the July 2020 Restraining Order

The Agency continued to receive referrals related to M.S., including allegations in 2018 and 2019 of general neglect, emotional abuse, and sexual abuse.[1] Most of these referrals were found to be inconclusive or to not meet the criteria for investigation.

---

[1] For instance, the Agency received reports in 2018 that the parents were constantly fighting and speaking negatively about each other in front of M.S.; that M.S. "complains that he is hungry at mother's house and he is left in a dark room at the end of the hallway" and "never gets to go out and play"; and that Mother took baths with M.S. and slept with him naked, during which M.S. was allowed to touch Mother's breasts and buttocks. In 2019, the Agency received referrals of general neglect related to Mother's act of smoking in the bedroom where M.S. sleeps, and M.S.'s discovery of a gun in Mother's home. Another referral alleged that Father emotionally abused

2

On February 7, 2020, Father called the Lakeport Police Department and requested a welfare check on M.S. at Mother's residence. According to Father, M.S., who was eight years old at the time, had sent him text messages, stating " 'Mommy want's to go bye bye' " and " 'Should I escape?' " Over the next 24 hours, Lakeport Police officers conducted four welfare checks at Mother's residence. On February 8, 2020, officers went to the home and found all of M.S.'s clothes and toys in a dumpster. Neighbors reported hearing Mother screaming at 2:00 a.m., and officers observed her to be "hysterical." M.S. reported that Mother spat in his face and drove him into the couch by putting her fist on his head, saying " 'I'm never gonna see you again.' " When M.S. attempted to leave, Mother locked him in a closet before throwing his clothes and toys in the dumpster. Mother admitted to yelling and cursing at M.S. from Friday evening until Saturday morning, spitting in his face, saying " 'fuck you' " to him, and throwing his belongings away. She explained her "love for her son changed" after a family court hearing because "she felt betrayed by her son," whose statements and lies to the court resulted in the denial of her request for increased time with him.

Father applied for a domestic violence restraining order (DVRO). At the DVRO hearing, Mother told the family court she was suffering from a nervous breakdown during the February 8 incident, and she asked the court to grant her supervised visitation with M.S.[2] On July 29, 2020, the family

---

M.S. by telling him Mother "is a 'sexual predator' and a 'bitch,' " and that Father physically abused M.S. by whipping him with a fly swatter.

[2] Here we note the Agency appears to take some of Mother's statements out of context. The Agency reports Mother made the following "concerning" remarks during the DVRO hearing: "When I'm alone with my son, I knew the minute that I got overnight visits, Your Honor, that I was going to be a sexual predator. I already knew that one was coming"; and "I know having my son alone is not going to work." Though the statements may seem

court issued a DVRO prohibiting Mother from having any contact with M.S. and requiring her to stay at least 50 yards from him for a period of three years. The family court granted sole legal and physical custody to Father and ordered no visitation for Mother until further order of the court.

### C. The Instant Dependency Case

In June 2023, the Agency filed another dependency petition on behalf of M.S., then 11 years old, alleging he came within the provisions of Welfare and Institutions Code[3] section 300, subdivisions (b)(1) and (c), due to both parents' histories of mental illness, drug use, and domestic violence.

In its detention report, the Agency reported Father had significant untreated mental health issues, unstable housing, and a history of criminal, domestic violence, and substance abuse issues. Believing he was being stalked by gangs and drones, Father intended to " 'live off the grid' " with M.S. and "protect themselves with firearms if necessary." M.S. reported that Father believed others were stalking and pointing "ray guns" at them, but he accepted some other of Father's beliefs. As for Mother, the Agency reported that she had not had contact with M.S. for three years due to the active DVRO, and that M.S. "reported he does not wish to see his mother because 'she hit me over and over and over all over my body with her hand, her ring and a hot heating pad.' " M.S. also said he "did not feel safe when he was living with her."

In August 2023, the juvenile court ordered that M.S. be detained and placed in the care of his prior foster family. At the jurisdiction hearing in

troubling on their face, when read in context they appear to reflect Mother's anticipation that she would be *falsely accused* of sexual abuse after she was granted overnight visits with M.S., and her belief that the presence of a third party during supervised visits would protect her from such accusations.

[3]    Further unspecified statutory references are to this code.

4

October 2023, the juvenile court found the allegations of the petition to be true by a preponderance of the evidence.

In its November 2023 disposition report, the Agency asked that M.S. be declared a ward of the court and that reunification services be given to Father, but not to Mother. The Agency concluded it was not in M.S.'s best interest to reunify with Mother as he "continues to refuse to have visits with his mother, and there is no evidence that his position will change." Mother "does not currently have a relationship with her son after a 3-year no-contact order and [M.S.] does not currently want to engage with his mother." Regarding visitation, the Agency noted the DVRO was "now expired, but [M.S.] does not want to visit with his mother currently. [Social worker] Martinez discusses the possibility of visiting with his mother often and his response has been that he does not want to visit."

On January 10, 2024, the juvenile court held a contested disposition hearing. Minor's counsel told the court that she had just spoken to M.S. and "his stance has been very consistent throughout this case; he does not want the mother to receive any services, he hasn't had any visits, does not want to visit the mother. He's been put through a lot. There's molestation allegations and he does not feel comfortable."[4] Mother testified she had been under the care of a therapist for four years and was prescribed psychotropic medication for bipolar disorder and anger problems. She regularly tested negative for drug use and was maintaining a stable home. Mother further testified that beginning in July 2023, after the DVRO expired, she began

---

[4]    The reporter's transcript of the disposition hearing was not included in the record of the instant appeal. On our own motion, we take judicial notice of this transcript, which is part of the appellate record in Mother's prior appeal, case No. A169688. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

5

regularly sending letters and gifts to M.S. A social worker gave the letters to M.S., who "seemed indifferent" to them but read them and said, "thank you."

In its January 24, 2024 disposition order, the juvenile court granted family reunification services to Father but bypassed them for Mother. In so ruling, the court explained: Mother "was subject to a restraining order until July of last year. The mother has no relationship with the child at this point. The child does not want a relationship with his mom. And the issues that led up to the restraining order, though mitigated at this point, were in an acute stage just a few months ago, meaning her mental health issues. [¶] And while I applaud the mother for the steps she has taken to deal with her mental health, we've already terminated the services that were being offered based on her lack of compliance with them. And so, at this point, I believe she qualifies . . . for bypass." The court ordered that Mother was to have no in-person or telephone contact with M.S. but permitted her to have "[w]ritten communication sent to the social worker."

Both parents appealed from the disposition order. However, Father unexpectedly passed away before his appeal could be decided, and his appeal was dismissed in June 2024. Mother's counsel filed a no-arguable-issues brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, and after Mother failed to file a supplemental brief, her appeal, too, was dismissed.

In the meantime, the juvenile court set the matter for the six-month review hearing. In an addendum report, the Agency told the court that despite the limited contact permitted by the disposition order, M.S. kept " 'running into' his mom out in the community on multiple occasions," and that "Mother has been pushing the boundaries of the existing orders for no in-person visitation. On one recent occasion, Mother called [M.S.] over and asked him to make a 'pinky promise' that he would ask [the Agency] to

arrange a visit.  [The Agency] had concerns about the manner in which this request was made, but did facilitate a Zoom visit at [M.S.'s] request.  [M.S.] appears to be open to Zoom visitation at this time."

In a July 2024 addendum report, the Agency reported that two virtual visits in June had gone "well, but there are still concerns" because Mother would ask M.S. "to make promises during the visit to ask [the Agency] for other visits and in the recent visit, ask for in-person contact."  Mother would also offer to buy things for M.S. even though the visitation rules prohibited making or extracting promises.  The Agency noted that M.S. had "a desire to live with his father, but now that [Father] is deceased, [M.S.] has made it clear he is open to visiting with his mother but would like to remain with his foster parents and reside with them."

At the six-month review hearing, minor's counsel advised the juvenile court that M.S. had requested in-person visits with Mother.  The Agency's counsel agreed to in-person visitation, subject to the Agency's discretion and M.S.'s comfort level.  The court ordered supervised in-person visitation and set the matter for a permanency planning hearing on December 2, 2024.

In October 2024, Mother filed a motion for the juvenile court to authorize a bonding study.  At the hearing on the motion, Mother's counsel explained that Mother and M.S. had a few "really good" virtual visits, but that the Agency "doesn't even have the Zoom visits delivery service [or visitation] logs.  They didn't log them, Your Honor.  So I don't have adequate evidence to show there is a bond between the child without this study."  Counsel further explained that in-person visits had only just begun that September, and there were indications that M.S. loved Mother and wanted visits, as "he ran to her and embraced her" at the last meeting.

7

Minor's counsel reported there were "some issues with the mother making certain remarks to [M.S.] in the visits that were inappropriate, just some physical touching that's just made him uncomfortable as well. . . . And he actually doesn't really want that much contact with her. But he does feel a little bit sad, you know, that his father died. And so he feels sad because the mother sort of guilt trips him into wanting these visits." Minor's counsel emphasized that M.S. "has made it very, very clear that he wants to be adopted by his current placement. I believe the agency asked him, adoptions asked him, I asked him. . . . He's very bonded to that family, and he's been there since the inception of this case. He barely wants any visits with his mom. They just started visiting after there was like a two- or three-year restraining order."

The juvenile court denied Mother's request for a bonding study, finding that it was "too late in the . . . process at this time", and that in light of M.S.'s stated desire to be adopted, it was in his best interest to go forward with permanency planning.

In its section 366.26 report, the Agency recommended terminating Mother's parental rights and selecting a permanent plan of adoption. The Agency noted M.S. had been placed with his prospective adoptive family since August 2023 and was likely to be adopted. The Agency submitted an adoption assessment completed by adoptions specialist Jennifer Heiss of the California Department of Social Services. Heiss found that M.S. was "not interested in having any unsupervised contact with his mother and has expressed feeling uncomfortable at times in her presence, due to things she has said or done during their visitation time." Heiss further found M.S. had a developmentally appropriate understanding of adoption and, when given a choice between legal guardianship and adoption, stated he was interested in

being adopted. Heiss also addressed the statutory elements of the beneficial relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and explained why she did not believe the exception should preclude termination of Mother's parental rights.

The Agency further informed the juvenile court that the in-person visits with Mother, which had occurred twice per month since June 2024, had caused M.S. "some distress. He's had to work through those questions with his therapist." M.S. "specifically asked the social worker, please don't step out of the room during those visits because he has concerns about . . . being alone with his mother even for a brief moment." The Agency convened a child and family team meeting "where the team discussed what the problems were with visitation." The Agency concluded no beneficial relationship existed between M.S. and Mother that should prevent the termination of parental rights.

Mother argued the beneficial relationship exception applied because she had maintained regular visitation after the first dependency case closed in 2013 until February 2020, which amounted to most of M.S.'s life. She further noted that M.S. wanted to have visits with her, and that a bonding study was necessary because the social worker could not provide a fair representation of the parent-child bond. Mother's counsel complained that the Agency had not provided any delivery service logs to the juvenile court; that she had received only one log in advance of the hearing; and that after asking the Agency for delivery service logs, "they just came in" that morning. Counsel received no logs of the June 2024 virtual visits. The Agency's counsel explained that there were no logs of the June 2024 virtual visits because the social worker who supervised those visits "left without having entered those" and was no longer employed with the Agency.

9

Minor's counsel argued that M.S. wanted to be freed up for adoption, that none of the exceptions to termination of parental rights applied, and that the incidental benefits of visits did not outweigh the permanency of adoption. According to counsel, M.S. "feels that he sort of has to . . . visit with his mom. There has been some guilt around that, and that's something he has to work through in therapy as well."

The section 366.26 hearing was held on December 2, 2024, but Mother did not appear. The juvenile court found there was "no real evidence of a beneficial parental bond as it applies to [M.S.] Meaning that [M.S.] isn't getting any benefit out of it. Maybe mom is, but [M.S.] isn't. And seeing no evidence that there is that bond—also mom isn't here, so I can't get her take on it directly." The court further noted that there had been a three-year gap in the relationship due to the DVRO, and that M.S. was likely to be adopted and had asked to be adopted. The court expressed its belief that M.S. "understands the circumstances and what is appropriate for him." Based on these findings, the court found the parental benefit exception did not apply, and it terminated Mother's parental rights. Mother timely appealed.

## DISCUSSION

### A. Legal Principles

At a section 366.26 hearing, the juvenile court may order one of three alternative permanent plans: adoption, guardianship, or long-term foster care. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224 (*B.D.*).) If the juvenile court finds by clear and convincing evidence that the child is likely to be adopted (§ 366.26, subd. (c)(1)), the court shall terminate parental rights to allow for adoption, subject to several statutory exceptions (§ 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).) It is the parent's burden to show that termination of parental rights would be detrimental to the child under one of

10

the exceptions listed in section 366.26, subdivision (c)(1).  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.)

At issue here is the beneficial relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

A parent must prove three elements to establish this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), italics omitted.)  The first two elements are factual determinations reviewed for substantial evidence, while the third element involves both factual determinations reviewed for substantial evidence, as well as the juvenile court's weighing of the harm of losing the relationship against the benefits of placement in a new, adoptive home, which is reviewed for abuse of discretion.  (*Id.* at pp. 639–641.)

In evaluating whether the beneficial relationship exception applies, we do not consider the possibility that visits will continue after adoption. Rather, we "must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  If severing the natural parent-child relationship would deprive a "child of a substantial, positive emotional attachment such that the child would be greatly harmed,

11

the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

### B. Analysis

#### 1. *Regular Visitation and Contact*

As to the first *Caden C.* element, there is no dispute that Mother consistently visited M.S. to the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

#### 2. *Benefit from Continuing the Relationship*

A beneficial parent-child relationship " ' " 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' " ' " (*B.D.*, *supra*, 66 Cal.App.5th at p. 1225.) "[T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary— even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Here, the juvenile court found that there was "no real evidence of a beneficial parental bond" or "any evidence of a beneficial relationship," and

12

that M.S. was not "getting any benefit out of" his visits with Mother. Mother insists the court did not have a sufficient record to make this determination because the Agency failed to provide objective, disinterested information about the nature and quality of M.S.'s relationship with Mother, including delivery service logs of their visits. She relies on a trio of decisions, *In re Dy.P.* (2022) 76 Cal.App.5th 153 (*Dy.P.*), *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*) and *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*), which we address below.

In *Dy.P.*, the appellate court reversed an order terminating a mother's parental rights because the juvenile court "performed no specific analysis on the beneficial parental relationship exception, instead finding only that the parents presented inadequate evidence to justify any exception." (*Dy.P.*, *supra*, 76 Cal.App.5th at p. 166.) The court highlighted evidence in the record supporting the second *Caden C.* element, as the mother testified that her children (ages 16, 15, 14, 3, and 2) had lived with her their entire lives, were "very close" to her and said they "loved her, called her mom, ran to her when they started the visits, routinely asked when they would be coming home with her, and . . . were happier with her than with the caretakers." (*Id.* at p. 167.) The *Dy.P.* court observed that the mother's testimony was supported by "[t]he available visitation logs, drafted by a social worker and included with the disposition," which showed that "the children did immediately hug the parents or run towards them at the beginning of at least some of the visits" and "called mother 'mom' or 'mommy,' " and that "the parents parented the children during the visits." (*Ibid.*) The logs also indicated no concerns were noted at the visits. (*Ibid.*)

In *J.D.*, our colleagues in Division Two of this district reversed a decision of the juvenile court terminating a mother's parental rights because

it could not "be certain the juvenile court did not consider factors disapproved of in *Caden C.*," such as the child's attachment to the foster parent, the mother's failure to occupy a "parental" role, and the possibility of postadoption contact. (*J.D.*, *supra*, 70 Cal.App.5th at pp. 863–864.) Additionally, the *J.D.* court criticized the child welfare agency for providing "very little information in its prior reports during the case about the quality of mother's relationship with J.D. or even the nature of her interactions with him during visitation. That was not appropriate and did a disservice to not just mother and J.D. but also the juvenile court." (*Id.* at p. 860.) Highlighting the "critical role that social workers play in our dependency scheme, and the objectivity they must bring to the task," *J.D.* held that by the time of the section 366.26 hearing, a child welfare agency's reports should have "provided objective, disinterested information about the quality of [the child's] attachment to [the parent], which would have assisted the court in evaluating the beneficial relationship exception." (*J.D.*, at p. 861.)

Finally, *D.M.* found the juvenile court there erroneously focused on factors disapproved of in *Caden C.* (e.g., whether the father occupied a parental role), and failed to adequately address the degree of attachment between the father and the dependent children. (*D.M.*, *supra*, 71 Cal.App.5th at pp. 270–271.) On the latter point, the *D.M.* court observed the child welfare agency's "reports gave the court little evidence about the quality of the visits between father and the children, or how the children felt about father. The children were rarely, if ever, asked how they felt about father or whether they enjoyed visits with him." (*Id.* at p. 270.)

Although these decisions generally support Mother's contention that the Agency had a duty to provide detailed information to the juvenile court regarding Mother's visits and relationship with M.S., the instant matter is

14

distinguishable in a critical respect. Specifically, at the time the second dependency petition was filed in June 2023, Mother was still subject to a DVRO that had prohibited her from all contact with M.S. for nearly three years. Even after the DVRO expired in July 2023, M.S. continued to refuse visitation with Mother for nearly a year, and he only began to change his mind around the six-month review period. Thus, for most of the duration of this dependency case, there was simply no occasion for the Agency to observe and document the quality of the parent-child relationship.

True, once visits began in June 2024, the Agency was required to report to the juvenile court on "the amount of and nature of" the contacts between Mother and M.S. (§§ 366.22, subd. (c)(1)(B), 366.21, subd. (i)(1)(B).) Moreover, the cases discussed above establish that the Agency's role in this regard is to provide objective, disinterested information in sufficient detail to assist the juvenile court in evaluating whether the beneficial relationship applies. (*J.D.*, *supra*, 70 Cal.App.5th at p. 861; *D.M.*, *supra*, 71 Cal.App.5th at pp. 270–271.) Here, the Agency's addendum reports and section 366.26 report[5] indicated the visits went "well," but there were no detailed descriptions of the interactions between Mother and M.S. during the review periods that might have informed the court's analysis on the existence of substantial and positive parent-child bond.

---

[5] As the *J.D.* court observed, "there is tension in the case law concerning the extent to which the agency must address facts pertinent to the beneficial relationship exception in the section 366.26 report itself," and the court expressed no opinion on the adequacy of the section 366.26 report before it. (*J.D.*, *supra*, 70 Cal.App.5th at p. 861.) Nevertheless, *J.D.* noted that "by the time the juvenile court scheduled the section 366.26 hearing, the agency's prior reports should have already provided objective, disinterested information about the quality of J.D.'s attachment to his mother, which would have assisted the court in evaluating the beneficial relationship exception when mother asserted it." (*J.D.*, at p. 861.)

15

We also agree with Mother that the Agency should have provided all available delivery service logs to her in advance of the section 366.26 hearing rather than on the morning thereof. As the cases show, visitation logs can be highly relevant to the court's analysis of the beneficial relationship exception. (See *Dy.P.*, *supra*, 76 Cal.App.5th at p. 167 [visitation logs were included with disposition report and supported mother's testimony at permanency planning hearing]; *J.D.*, *supra*, 70 Cal.App.5th at p. 856 [visitation logs provided "an extremely telling glimpse of how" child felt and interacted with parent].) The Agency did not deny that Mother's counsel requested production of the visitation logs in advance of the hearing or explain why available logs were not produced earlier.

That said, even if we assume the juvenile court should have received more detailed information from the Agency on the 2024 visits before making a factual determination on the beneficial relationship exception, we ultimately conclude Mother has not demonstrated the error was prejudicial. "In determining whether an error is harmless in a juvenile dependency proceeding, we must decide whether the error caused a miscarriage of justice," meaning "we must decide whether it is reasonably probable the result would have been more favorable to the appellant but for the error." (*In re M.S.* (2019) 41 Cal.App.5th 568, 591, citing *In re Celine R.* (2003) 31 Cal.4th 45, 59–60.)

Here, Mother eventually obtained (albeit belatedly) a number of visitation logs from 2024, but she did not request additional time to review them and made no claim that the logs she received were inadequate or incomplete. Critically, Mother does not contend the logs contained any evidence that would have assisted her in demonstrating a substantial parent-child bond, and she did not include the logs as part of the record on appeal.

16

(See, e.g., *J.D.*, *supra*, 70 Cal.App.5th at p. 856 [detailed visitation log entries provided "intimate, personal and touching" details on parent-child bond].) Meanwhile, Mother does not dispute the Agency's assertions that during some of the visits, M.S. experienced distress, discomfort, and unwelcome physical contacts, and that M.S. specifically told a social worker he did not want to be left alone with Mother. Thus, even assuming the logs might have documented certain positive interactions during the visits with Mother, the juvenile court could still reasonably conclude that the record of visits was mixed at best, and that M.S.'s statements of discomfort and distrust belied the existence of a positive, emotional attachment to Mother. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [courts often consider how children feel about parents in assessing benefits of relationship]; *In re I.E.* (2023) 91 Cal.App.5th 683, 694 [child's statements "powerfully demonstrate the child did not have the type of attachment with mother that would cause the child to suffer detriment in the event of a termination of parental rights"].)

We must also emphasize that "[t]he kind of parent-child bond the court may rely on to avoid termination of parental rights under the [beneficial relationship] exception . . . does not arise in the short period between the termination of services and the section 366.26 hearing." (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1196.) Thus, even assuming the Agency had provided reports and visitation logs showing moments of bonding between Mother and M.S. during the 2024 visits, we are not convinced this brief period of engagement would have likely caused the court to find that a beneficial relationship existed given the circumstances as a whole, including the nearly four-year period in which the two had no relationship to speak of and the evidence of M.S.'s post-DVRO indifference and concerns about Mother.

Mother nevertheless insists she and M.S. had a preexisting bond "which simply would not have vanished within a couple of years." We acknowledge that a multi-year gap in a parent-child relationship due to a restraining order should not categorically preclude a beneficial relationship finding. But our difficulty in assessing Mother's argument stems from her failure to cite to any evidence in the record on the nature and quality of her relationship with M.S. prior to the issuance of the DVRO in July 2020, let alone evidence from which it is reasonably probable that the court would have found "a substantial, positive emotional attachment" (*Autumn H., supra*, 27 Cal.App.4th at p. 575) or "a strong, positive, and affirming relationship" between Mother and M.S. (*Caden C., supra*, 11 Cal.5th at p. 634).

As recounted above, M.S. was first detained by the Agency at three months of age, and only Father reunified with him during the first dependency case. Thus, for M.S.'s entire life, Mother was never his primary caretaker. Although Mother was granted supervised visitation with M.S. from 2013 to 2020, she cites no evidence in the record regarding the nature and quality of those visits.[6] Moreover, during this time, the Agency continued to receive concerning referrals regarding M.S., including a 2018 referral that M.S. "is hungry at mother's house and he is left in a dark room at the end of the hallway" and "never gets to go out and play." Then, after the February 2020 incident of physical and verbal abuse, the two had no relationship for three years while the DVRO was in effect, and even after the

---

[6] Mother does not argue the Agency had a legal duty to provide the juvenile court in the second dependency case with visitation records from the first dependency case in order to assist the court in determining whether a beneficial relationship existed. We accordingly express no opinion on that question.

DVRO expired, M.S. refused visitation with Mother for nearly a year, citing the physical abuse he had sustained from Mother and stating "he did not feel safe when he was living with her." Although Mother sent letters and cards to M.S., he was "indifferent" to them.

We acknowledge the existing record may not adequately capture the nature of Mother and M.S.'s relationship over the years. And while it is true the Agency has an independent responsibility to provide objective information to the juvenile court regarding visitation—and the Agency could have done more in this case—it ultimately remains the parent's burden to show the applicability of the beneficial relationship exception and the juvenile court's prejudicial abuse of discretion on appeal. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.) The record before us reflects that Mother did little in attempting to sustain her burden.[7] As such, we conclude any error by the juvenile court in making its ruling without receiving more information from the Agency on visitation was ultimately harmless.

### 3. Detriment from Termination of Relationship

For the third *Caden C.* step, the juvenile court must determine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should

---

[7] The record does not indicate why Mother did not attend or testify at the section 366.26 hearing. Such testimony could have provided the court with specific details and examples of Mother's relationship with M.S. and their interactions during the visits that took place both before and after the DVRO. As the juvenile court pointed out, Mother's absence left the court unable to "get [Mother's] take on" her relationship with M.S.

19

not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.)

As the Supreme Court explains, this is "a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Moreover, we cannot assume visits may continue after adoption; instead, the pertinent question is what life will be like for M.S. in an adoptive home without Mother's involvement. (*Id*. at p. 633.)

Mother insists the circumstances of this case, including the death of Father during the proceedings and M.S.'s stated desire to visit Mother even after years of not seeing her, required the juvenile court to conduct a "deeper dive into the emotional consequences to M.S. of depriving him of his Mother's association."

Mindful of the governing principles, and granting that Father's death may have impacted M.S.'s decision to renew visitation with Mother late in the proceedings, we nonetheless conclude the juvenile court did not abuse its discretion in determining that termination of Mother's parental rights would not be detrimental to M.S. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) As the record reflects, by the time of the section 366.26 hearing, M.S. and Mother had not maintained much of a relationship at all for nearly four years due to Mother's abusive conduct, the resulting DVRO, and M.S.'s unwillingness to visit her. Mother did not attend or testify at the section 366.26 hearing, and here she cites to no evidence of a significant, positive, and emotional attachment on M.S.'s part, either before or after the expiration of the DVRO. Meanwhile, M.S. was reportedly doing well in his prospective adoptive home and was likely to be adopted. And when asked, M.S. specifically chose a plan of adoption over legal guardianship. Despite M.S.'s willingness to begin visiting with Mother at the six-month review phase, the juvenile court could reasonably conclude this late development was insufficient to outweigh the benefits of permanency in a new adoptive home. Indeed, M.S. remained uncomfortable and unwilling to be left alone with Mother, and there was also evidence from which the court could infer that Mother exerted improper influence on M.S. to request the visits in the first place.

In sum, on the record before us, we conclude the juvenile court reasonably found that any harm of severing Mother and M.S.'s relationship did not outweigh the security and stability that M.S. stands to receive in his new adoptive home.

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

21

_____
Fujisaki, Acting P.J.

WE CONCUR:

_____
Petrou, J.

_____
Rodríguez, J.

_Lake County SSA v. D.S._ (A172076)

22